**SIGNED this 9th day of November, 2011**

_____
Shelley D. Rucker
UNITED STATES BANKRUPTCY JUDGE

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                                    No. 10-14804
                                                          Chapter 11
THE 28TH LEGISLATIVE DISTRICT
COMMUNITY DEVELOPMENT
CORPORATION,

       Debtor(s)

Appearances:

    Kyle R. Weems, Weems & Ronan, P.C., Chattanooga, Tennessee, and Whitney Durand, Chattanooga, Tennessee, for the debtor, The 28th Legislative District Community Development Corporation

    Harry R. Cash, Grant, Konvalinka & Harrison, P.C., Chattanooga, Tennessee, for Chattanooga Community Development Financial Institution, Inc.

Andrea Campbell, Arent Fox, LLP, Washington, DC, for Seedco Financial Services, Inc.

Shelley D. Rucker, United States Bankruptcy Judge

## MEMORANDUM

The confirmation hearing on the Plan of Reorganization ("Plan") of the debtor was conducted on October 27, 2011. Counsel for the debtor, for the United States Trustee, and for the creditors, Chattanooga Community Development Financial Institution ("CCFDI") and Seedco Financial Services, Inc. ("Seedco") appeared. CCFDI and Seedco objected to the confirmation on identical bases. They alleged that the Plan cannot be confirmed because the Plan does not comply with the requirements of 11 U.S.C. § 1129(a). Specifically they allege that (a) the debtor fails to offer the creditors more than they would receive in a Chapter 7; (b) no impaired class of creditors has accepted the Plan; (c) the Plan discriminates unfairly; and, (d) the Plan violates the absolute priority rule.

Based on the arguments of counsel, the testimony of Mr. Joelander Wheeler, the executive director for the debtor, the exhibits and briefs filed, and the record in this case, the court makes the following findings of fact and conclusions of law pursuant to Fed. R.Bankr.P. 7052, made applicable to contested matters pursuant to Fed.R.Bankr. P. 9014(c).

The primary point of contention is whether the real property owned by the debtor and purchased with grant proceeds is property that would be available to distribute to creditors. The parties agree that there are no liens, restrictions or security agreements of record that would put a bona fide purchaser on notice that the debtor has no equitable interest in 14 of the 15 tracts. The debtor contends that there does not have to be any such notice on the deeds. It contends that these properties are trust fund proceeds which are not available for creditors based on the terms and conditions under which the funds were provided to the debtor. If the court finds that these real properties are available for creditors, then the debtor's plan does not comply with the Bankruptcy Code and confirmation should be denied. If the court agrees with the debtor then it must address the other objections raised by CCDFI and Seedco. Based on the following findings of fact and conclusions of law, the court finds that 13 tracts and the debtor's headquarters are not assets available for creditors; and, subject to disposal of one tract for the benefit of creditors, the plan is confirmable.

**Background**

The debtor is a not-for-profit general welfare Tennessee corporation. It describes itself as a private, locally initiated non-profit community-focused organization created to improve the quality of life for all residents of the community. It is "to act as a catalyst for economic and community development for the Chattanooga neighborhoods that comprise the 28th Legislative District.[1] *Second Amended Disclosure Statement*, p. 3 (Docket Entry No. 168). One of its primary functions is to buy distressed residential properties in the district and rehabilitate them. Those properties are then sold to individuals with low to marginal incomes. At the date of confirmation the debtor had 15 properties titled in its name. The status of the properties ranged from ready-to-sell, to under-construction, to vacant lots.

*HOME Program*

Thirteen properties were purchased with grant money from three different sources. The first source is the HOME program. The HOME Investment Partnerships Program ("HOME") is codified at 24 C.F.R. § 92.1 (2010). In implementing the HOME Investment Partnerships Act ("The Act"), the Department of Housing and Urban Development ("HUD") allocates funds to eligible state and local governments to provide safe, decent, and affordable housing for very low-income and low-income families. Sub-Part K of the HOME provisions outlines the requirements for administration of the program. 24 C.F.R. § 92.500. HUD establishes a HOME Investment Trust Fund United States Treasury account for each participating jurisdiction which may, in turn, either use a separate local trust fund account or a subsidiary account within its general fund (or other appropriate fund) as the local HOME Investment Trust Fund account. 24 C.F.R § 92.500(a). The local account includes deposits of HOME funds disbursed from the United States Treasury account; any state funds; local funds that enable the jurisdiction to meet a participating threshold amount described in 24 C.F.R. § 92.102(b)(2); any program income (from allocated funds and matching contributions); and any repayment or recaptured funds. 24 C.F.R. § 92.500(c)(1). The income from the HOME Program must be used in accordance with the requirements set forth in the HOME Investments Partnership Act, and the funds must be deposited in the HOME Investment Trust Fund local account "unless the

---

[1] According to the debtor's Second Amended Disclosure Statement filed September 15, 2011, and conditionally approved by order entered September 16, 2011, the 28th Legislative District includes low and moderate income designated neighborhoods of Alton Park, Avondale, Bushtown, Dalewood, Downtown (which includes several Renewal designated neighborhoods), Eastdale, East Chattanooga Glenwood, Highland Park, Orchard Knob, Piney Woods, South Chattanooga, and the mixed income neighborhoods of St. Elmo.

participating jurisdiction permits the State recipient or subrecipient to retain the program income for additional HOME projects" in accordance with the terms of a written agreement required by 24 C.F.R. § 92.504.  24 C.F.R. § 92.503(a)(1).  Eligible activities for which HOME funds may be used are set forth in section 92.205:

a. *Eligible activities.*

1. HOME funds may be used by a participating jurisdiction to provide incentives to develop and support affordable rental housing and homeownership affordability through the acquisition (including assistance to homebuyers), new construction, reconstruction, or rehabilitation of non-luxury housing with suitable amenities, including real property acquisition, site improvements, conversion, demolition, and other expenses, including financing costs, relocation expenses of any displaced persons, families, businesses, or organizations; to provide tenant-based rental assistance, including security deposits; to provide payment of reasonable administrative and planning costs; and to provide for the payment of operating expenses of community housing development organizations. The housing must be permanent or transitional housing….

2. Acquisition of vacant land or demolition must be undertaken only with respect to a particular housing project intended to provide affordable housing.

3. Conversion of existing structure to affordable housing is rehabilitation, . . .

24 C.F.R. § 92.205(a)(1)-(3)(2010).

HOME funds must be repaid to HUD if they are invested in housing that does not meet the requirements of the HOME program, or if a project in which HOME funds are invested is terminated before completion.  24 C.F.R. § 92.503(b)(1), (2).  If the HOME funds housing provided to the qualifying homeowner ceases to be the principal residence of the family for the duration of the period of affordability, then there is a provision for "recapture" of the HOME funds, in part or in whole, from the homebuyer.  24 C.F.R. 92.254(a)(5)(ii).  Funds that are "recaptured" in accordance with 92.254(a)(5)(ii) must be used

> in accordance with the requirements of this part. Recaptured funds must be deposited in the participating jurisdiction's HOME Investment Trust Fund local account unless the participating jurisdiction permits the . . . community housing development organization to retain the recaptured funds for additional HOME projects pursuant to the written agreement required by § 92.504. If the jurisdiction is not a participating jurisdiction when the recaptured funds are received, the funds must be remitted to HUD and reallocated in accordance with § 92.454 [Reallocations by Formula].

24 C.F.R. § 92.503(c)(2010).

The City of Chattanooga ("City") is the recipient of HOME funds and contracts with the debtor to provide funds from the HOME grants to assist the debtor in providing affordable home ownership housing activities to eligible recipients. The agreements between the City and the debtor refer to and incorporate 24 C.F.R. Part 92. The agreements also provide that the debtor must have a written project development agreement with the City prior to undertaking a project, and the project development agreement also refers to 24 C.F.R. Part 92.

According to the agreements between the debtor and the City attached as various exhibits to memoranda submitted by the debtor, unexpended grant funds are retained by the City of Chattanooga but "[u]pon written request, the City may consider the reallocation of unexpended funds to eligible projects proposed by Subrecipient." *Agreement between 28th Legislative District Community Development Corporation and the City of Chattanooga in the amount of $300,000 for Fiscal Year 2009-2010, Article IV.I, p. 6* ("2009-10 HOME Agreement").[2] The 2009-10 HOME Agreement further provides for excess proceeds from resold properties:

> [The debtor] may retain proceeds generated from HOME-assisted projects for which it is not considered a subrecipient. A subrecipient means a public agency or non-profit organization selected by the City to administer all or a portion of the City's HOME program. A public agency or nonprofit organization that receives HOME funds solely as a developer or owner of housing is not a subrecipient. While the proceeds retained by [the debtor] are not subject to the requirements of 24 CFR Part 92, the organization must use such proceeds for housing activities to benefit low-income families. Such activities include expenses that are necessary for the operation of the organization. [The debtor] agrees to report to the City on an annual basis, the source and use of such proceeds.

*2009-10 HOME Agreement,* Article V.A, p. 6. The agreement between the City and the debtor contains specific requirements with respect to the use of the HOME funds. The agreements also include requirements for extensive record-keeping, reporting and monitoring. *See 2009-10 HOME Agreement*, Article VI. Accordingly, the terms of the agreements between the City and the debtor, as well as the requirements of the applicable regulations, impose sufficient restrictions on the debtor's use of the grant funds such that the debtor is, by analogy, in the role of a trustee of the funds, lacking the freedom to dispose of the funds beyond the requirements set forth in the agreements

---

[2] Copies of similar Agreements for the fiscal years 2008-2009 in the amount of $214,000, and for 2010-2011 in the amount of $350,000 are attached as exhibits to the debtor's "Memorandum of Law Regarding Exclusion of Trust Funds from the Bankruptcy Estate Summary." The copy of the 2010-2011 Agreement provided with the Memorandum is incomplete in that only 21 of 24 pages were included. Although copies of the agreements were not introduced into evidence at the confirmation hearing, Mr. Wheeler testified concerning the sources of the funds obtained by the debtor and how the funds were expended or otherwise used by the debtor. His testimony was not refuted.

and the regulations. *See In re: West Central Housing Development Organization*, 338 B.R. 482, 488 (Bankr. D. Colo. 2005).

> *Neighborhood Stabilization Grants*

The second source of funding for the debtor is Neighborhood Stabilization Grants. According to a copy of an agreement among the debtor, the State of Tennessee, and the Tennessee Housing Development Agency for 2009, these grants originate from and are made available through HUD under Title III of Division B of the "Housing and Economic Recovery Act of 2008" (HERA), as amended by Title XII of Division A of the "American Recovery and Reinvestment Act of 2009." *NSP Agreement NSP1-09-033 Between the State of Tennessee, Tennessee Housing Development Agency and 28th Legislative District Community Development Corporation"* ("NSP Agreement"). The NSP Agreement also incorporates the requirements of 24 C.F.R. § 570, *et seq.*, concerning Community Development Block Grants ("CDBG"). *NSP Agreement*, Part E.11.d. The provisions of 24 C.F.R. § 570.201 set forth eligible activities for use of the funds, including acquisition of real property for public purpose; disposition of real property acquired with grant funds, provided that the proceeds from such disposition constitute program income subject to the requirements of 24 C.F.R. § 570.504; clearance, demolition, and removal of buildings and improvements; public services, including fair housing counseling and homebuyer downpayment assistance subject to certain restrictions with respect to the amount of the grant used for such services; construction of housing; and homeownership assistance. The NSP Agreement further provides that the debtor must use the grant funds "pursuant to . . . all requirements of 24 C.F.R. Part 570 unless otherwise waived by HERA." *NSP Agreement,* Part E.11.j, p. 14. Provision for disposition of income from the program is set forth in 24 C.F.R. § 570.504:

> (1) Program income [defined in 24 C.F.R. § 570.500] received before grant closeout may be retained by the recipient if the income is treated as additional CDBG funds subject to all applicable requirements governing the use of CDBG funds.
>
> (2) If the recipient chooses to retain program income, that program income shall be disposed of as follows:
>
> (i) Program income in the form of repayments to, or interest earned on, a revolving fund as defined in § 570.500(b) shall be substantially disbursed from the fund before additional cash withdrawals are made from the U.S. Treasury for the same activity. (This rule does not prevent a lump sum disbursement to finance the rehabilitation of privately owned properties as provided for in § 570.513.)

> (ii) Substantially all other program income shall be disbursed for eligible activities before additional cash withdrawals are made from the U.S. Treasury.
>
> (iii) At the end of each program year, the aggregate amount of program income cash balances and any investment thereof (except those needed for immediate cash needs, cash balances of a revolving loan fund, cash balances from a lump-sum drawdown, or cash or investments held for Section 108 loan guarantee security needs) that, as of the last day of the program year, exceeds one-twelfth of the most recent grant made pursuant to § 570.304 shall be remitted to HUD as soon as practicable thereafter, to be placed in the recipient's line of credit. This provision applies to program income cash balances and investments thereof held by the grantee and its subrecipients. (This provision shall be applied for the first time at the end of the program year for which Federal Fiscal Year 1996 funds are provided.)
>
> (3) Program income on hand at the time of closeout shall continue to be subject to the eligibility requirements in Subpart C and all other applicable provisions of this part until it is expended.
>
> (4) Unless otherwise provided in any grant closeout agreement, and subject to the requirements of paragraph (b)(5) of this section, income received after closeout shall not be governed by the provisions of this part, except that, if at the time of closeout the recipient has another ongoing CDBG grant received directly from HUD, funds received after closeout shall be treated as program income of the ongoing grant program.
>
> (5) If the recipient does not have another ongoing grant received directly from HUD at the time of closeout, income received after closeout from the disposition of real property or from loans outstanding at the time of closeout shall not be governed by the provisions of this part, except that such income shall be used for activities that meet one of the national objectives in § 570.901 and the eligibility requirements described in section 105 of the Act.
>
> (c) Disposition of program income received by subrecipients. The written agreement between the recipient and the subrecipient, as required by § 570.503, shall specify whether program income received is to be returned to the recipient or retained by the subrecipient. Where program income is to be retained by the subrecipient, the agreement shall specify the activities that will be undertaken with the program income and that all provisions of the written agreement shall apply to the specified activities. When the subrecipient retains program income, transfers of grant funds by the recipient to the subrecipient shall be adjusted according to the principles described in paragraphs (b)(2) (i) and (ii) of this section. Any program income on hand when the agreement expires, or received after the agreement's expiration, shall be paid to the recipient as required by § 570.503(b)(8).

24 C.F.R. § 570.504.

The grant funds obtained by the debtor are to be used to purchase or rehabilitate the properties which are then sold in an amount equal to or less than the cost to acquire and redevelop or rehabilitate such home or property up to a decent, safe, and habitable condition. Any excess proceeds above the cost to acquire and redevelop the

property "shall be provided to and used by the State or unit of general local government in accordance with, and in furtherance of, the intent and provisions" of the Act. *Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289,* § 2301(d)(4)(A), 122 Stat. 2851-52. [3] Again, the terms of the NSP agreements and the references therein to specific statutory language concerning use of the grant funds place the debtor in a role analogous to a trustee with little discretion for use of the funds beyond the parameters established by the statute and the agreements. The debtor holds the grant funds in trust and is bound by federal regulations to act in the role of a trustee of the federal grant funds. It holds no beneficial interest in the funds. *See In re West Central Housing Development Organization*, 338 B.R. 482, 489 (Bankr. D. Colo. 2005)(citation omitted). Mr. Wheeler testified that the proceeds of the grant could also be used to pay the operational expenses of the CDC in furtherance of its work under the grant programs. He also testified that the proceeds could not be used to pay for projects that would not have qualified for the grant originally. The objecting creditors put on no proof to the contrary nor have they directed the court to any regulations or contract terms that would contradict Mr. Wheeler's testimony.

*Other Assets*

The third source of funding is from private contributions to the debtor. In the past the debtor has received real property and, in at least one instance, stock. These assets may be sold and used in any manner the debtor desires to use them. Mr. Wheeler testified that all of the debtor's assets in this category had been sold except for two lots which he valued at approximately $5000 each.[4] He testified that the proceeds of the stock had been used in the case to pay the attorneys fee for filing the bankruptcy and to pay adequate protection payments to Regions Bank earlier in the case. The one other asset held by the debtor is its headquarters. Its ownership is also restricted. The property may only be used for public purposes. The deed also contains a reversionary interest in favor of the State of Tennessee. *See also Second Amended Disclosure Statement*, Attachment 2 (Docket Entry No. 168).

The reason the debtor filed bankruptcy was because it had begun a project composed of high-end condominiums and commercial retail and office space within the district ("MLK Project"). The project was within

---

[3] The Act also provides that, upon expiration of the 5-year period following its July 30, 2008, enactment, any revenue generated from sale, rental, redevelopment, rehabilitation, or any other eligible use in excess of the cost to acquire and redevelop or rehabilitate an abandoned or foreclosed upon home shall be deposited in the United States Treasury unless the Secretary approves a request to use the funds for purposes under this Act. Neither the debtor nor the objecting creditors addressed the issue of any excess funds under these circumstances.

[4] At the November 9, 2011, hearing wherein the court read this opinion into the record, counsel for the debtor orally sought and was granted leave to clarify the record to reflect that only one tract of real estate valued at $5,000 was acquired from private contribution to the debtor. The second lot was traced to proceeds.

the mission statement of the debtor to improve the district, but it was not a project that qualified for grants from its two primary funding sources, which funded projects that benefited low and moderate income persons. For the MLK Project, the debtor had to obtain a commercial loan from Regions Bank for approximately $1,000,000, a second loan from CCDFI for $500,000 and a third loan Seedco for $500,000. The MLK Project was unsuccessful and was foreclosed prior to confirmation. The foreclosure left CCDFI and Seedco with deficiency claims. Amended Claim 36-2, Chattanooga Community Development Financial Institution, Inc., of $510,335.09, filed October 13, 2011; Amended Claim 37-2, Seedco Financial Services, Inc., of $510,335.09, filed October 13, 2011. [5]

In the Plan the Debtor proposes to pay nothing to these creditors on account of the deficiency claims. It proposes to pay Regions Bank's claim for a line of credit and a credit card which are unrelated to the MLK Project. Mr. Wheeler testified that the line of credit and credit card are used in the debtor's business and that the claims constitute an administrative expense which can be paid from grant funds.

This court has jurisdiction under 28 U.S.C. §1334 and§ 157(b)(2)(L)(confirmation of plans).

## ANALYSIS

### A. Debtor's Interest in the Real Property

The objecting creditors argue that the real property owned by the debtor is available for creditors. The debtor concedes that one lot is available for creditors but the remaining properties are not. The objecting creditors contend that the 15 tracts are held in the name of the debtor without any limiting designation. The executive director, Mr. Wheeler, conceded that the 15 tracts are held by the debtor without any designation of trust indicated on the real estate records. At the hearing on the final approval of the second amended disclosure statement and confirmation of the plan, counsel for CCDFI and Seedco argued that the state and federal government's interests in this case in placing limitations on the use of the property and its proceeds are secret liens that may be avoided by the debtor. *See also Regions Reply to Debtor's Response to Objection and Regions Response to Debtor's Supplemental Memorandum of Law*, p. 3 (Docket Entry No. 88); *Joinder of Seedco Financial Services, Inc. To Regions Reply to Debtor's Response to Objection and Regions Response to Debtor's Supplemental Memorandum of Law,* p. 1 (Docket Entry No. 94); *Joinder of Chattanooga Community Development Financial Institution, Inc. To Regions Reply to*

---

[5] To date, Regions has not filed a claim for a deficiency in the case.

*Debtor's Response to Objection and Regions Response to Debtor's Supplemental Memorandum of Law*, p. 1 (Docket Entry No. 95).  If the "liens" are avoided, the property should be available to the debtor to liquidate and use the proceeds to pay creditors. At a minimum, they contend that the value of that property should be included in calculating the amount the debtor must pay to unsecured creditors.  The debtor argues that these properties are the proceeds of trust funds and so retain their characteristics as property held in trust. The debtor has only legal title and therefore it has nothing to sell to pay unsecured creditors.  As such, the Plan which offers to pay them nothing is not paying them less than they would get in a liquidation.

This case presents an unusual set of facts. While it is usually the debtor seeking to bring property into the estate for its creditors, this debtor is advocating the position of creditors who have not appeared in the case – the City of Chattanooga, the State of Tennessee, and the United States.  The debtor's interest in advocating its position is because the failure to do so will result in the debtor losing its ability to obtain more grants in the future. Without the future grants, the debtor is out of business. The debtor's only remaining business since the loss of the MLK Project is managing and using grant funds, and these funds may only pay only obligations created in furtherance of the grant programs but not obligations created by the debtor's projects which may have been within the scope of the debtor's mission statement but were outside the scope of the grant funding. While this appears to be a somewhat arbitrary line for the debtor to draw, the concept that grant funds are beyond the reach of the debtor's general creditors is not without precedent.

In *West Central Housing Development Organization*, 338 B.R. 482 (Bankr. D.Colo.2005), the state sought to recover assets in the possession of the debtor, a community development corporation. The assets included cash, promissory notes from the sale of real estate and their accompanying deeds of trust. The trustee resisted under the theory that he could avoid the state's interest utilizing his strong arm powers under 11 U.S.C. § 544(a) as a bona fide purchaser of the real estate. The court found that the trustee only held personal property and that the bona fide purchaser provision only related to real estate. The court further stated that the "pivotal issue in this matter is whether or not [debtor] held the beneficial interest, as well as legal title, to the Revolving Loan Assets at the time the bankruptcy petition was filed."  *Id.* at 486. After reviewing the contracts and intergovernmental agency agreements admitted into evidence, the court concluded that

> all of those agreements recite that they are subject to state and federal
> regulations governing the granting and use of the subject funds. The restrictions

Page **10** of **16**

> contained in those regulations establish [the debtor's] role as holding only bare legal title to the Revolving Loan Assets in order to manage those assets for the benefit of individuals who were intended to receive assistance through the programs that [the debtor] administered.

*Id.* The court then proceeded to review each grant source and identify the regulations that place trust restrictions on the funds and the proceeds. One grant source analyzed is the HOME program which is specifically at issue in this case. *West Central Housing Development Organization*, 338 B.R. at 487-89. The court concluded that

> [t]hese federal regulations provide that a recipient of CDBG and HOME grant funds holds those funds in trust. The regulations have the force and effect of federal law, *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208(1979), and their provisions are binding on [the debtor] as a recipient of those federal grant funds. Even in the absence of a contractual obligation to hold the federal grant funds in trust, [the debtor] was bound by federal regulations to act in the role of a trustee of the federal grant funds. It held no beneficial interest in any of the Revolving Loan Assets derived from CDBG and HOME grant funds.

*Id.* at 489.

The court finds the same or similar restrictions to be in place in this case and finds the bankruptcy court's analysis in *West Central* to be persuasive.

The objecting creditors rely on *In re Premier Airways* to support their position that this case is different because it involves real estate. *Gaffney v. United States Department of Transportation, Federal Aviation Administration (In re Premier Airways, Inc.),* 303 B.R. 295 (Bankr. W.D.N.Y. 2003). *Premier* did involve real property held in the name of the debtor which was acquired with grant money from the Federal Aviation Administration ("FAA") for expansion of an airport. The grant included extensive conditions on the use of the property so acquired. The grant required Premier Airways to promise

> never to sell, mortgage or encumber the facility. In the event that the newly acquired parcels were no longer used as an airport, Premier was obliged to return a proportionate part of the proceeds of sale to the FAA, for re-deposit into the Airport and Airway Trust Fund, for future use according to the same regulations which controlled the grant to Premier.

*Id*. at 296. The trustee filed a motion for summary judgment on the issue of whether the FAA had an equitable lien on the real estate acquired by the debtor pursuant to a grant under the Airport Improvement Act that was superior to that of the trustee's interest under section 544 of the bankruptcy code. In its analysis, the *Premier* court reviewed a number of cases dealing with federal grants and the analyses conducted by other courts to determine whether the debtor's interests are those of a trustee with a limited ownership interest, or an owner with a full interest but

Page **11** of **16**

contractually limited. The court quoted Judge Posner's analysis of the issue contained in *In re Joliet-Will County Cmty Action Agency*, 847 F.2d 430 (7th Cir. 1988).  The issue is identified as

> whether the cash, and the personal property purchased with governmental grant money, are assets of [the debtor] and therefore within the power of the trustee in bankruptcy, or whether they are assets of the federal government and of the state agencies to which the federal government made some of the grants initially, for redistribution (along with the state's own money) to operating organization such as [the debtor]. The answer depends on the terms under which the grants were made. Did they constitute [the debtor] a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another? If so, the funds (and the personal property bought with them) were not assets of the bankrupt estate. Or were the grants more like property under a contract for promised performance not actually performed? The promisee would have a contractual claim for the return of the money he had paid, but he would not have a property right in the money.

*In re Premier Airways,* 303 B.R. at 297(*quoting In re Joliet-Will*, 847 F.2d at 432(citations deleted)).

Despite recognizing that all the cases found the grant monies to be unavailable to creditors and the quotation of the analysis, the *Premier* court dismissed this test on the basis that it only related to personal property. It found that the powers of trustee are more "comprehensive" with regard to real estate. *Id.* The *Premier* court held that the bankruptcy estate included all of the legal and equitable interests of the debtor as stated in section 541 of Title 11 of the United States Code, plus all interests which the trustee can recover in his status as a bona fide purchaser of the property on the date of filing.  FAA argued that the debtor held the real estate in trust; however, the *Premier* court noted that FAA made no argument for the application of 11 U.S.C. § 541(d). *Id.* at n.1.  The court also found that the debtor had some equitable interests in the property. *Id.* at 298.  In the case before this court and contrary to the argument made by the FAA, the debtor has raised this section of the Code in support of its position that it is merely an intermediary for some other party's money.  *Response to Objection by Regions Bank to Disclosure Statement*, p. 2-5 (docket entry no. 66). Further, this debtor has not contended that it has any equitable interest in this property. As such, the court finds the reliance on section 544 misplaced. The issue before the court is whether the 14 tracts are property of the estate, not whether the debtor's interest as a bona fide purchaser is superior to the claims of the Tennessee or the United States.

The court finds Judge Posner's question to be the appropriate analysis to apply. Here the debtor's interests are imposed with the characteristics of a trust. There are conditions on the initial grant. The debtor is regularly audited for compliance. There are reversionary requirements on the proceeds if they are not used in compliance with the original grant terms. The debtor provided evidence that all of the real property and the proceeds thereof are

traceable to restricted grant funds; therefore, the court finds that the real estate purchased with those funds is also trust property in which the debtor has only a legal interest. *Second Amended Disclosure Statement*, Attachment 1.

The objecting creditors also argued that the trust characteristics remain only until the funds are used to buy the real estate. This argument is taken from language in a line of cases discussing garnishment of federal funds. In another case involving HOME grant funds, the court found that grant funds could not be garnished. *Universal Security and Protection Service, Inc. v. Desire Community Housing Corp. (In re Universal Security and Protection Service, Inc.),* 223 B.R. 88 (Bankr. E.D.La. 1998). The debtor had provided security services to Desire Community Housing Corp. ("Desire") before filing its own bankruptcy. The debtor obtained a judgment against the Desire and garnished Desire's account. Desire sought return of the garnished funds on the basis that the funds were HOME grant proceeds and subject to garnishment. The court in a detailed discussion of the protections afforded federal grant monies concluded that the funds were not subject to garnishment. The court recited that "It is well settled that federal monies are not subject to garnishment proceedings until they have been paid out for the purposes for which they were appropriated." *Id.* at 91. (*citing Buchanan v. Alexander*, 45 U.S.(4 How.) 20, 11 L.Ed. 857 (1846)). The court quoted *Buchanan*, "So long as money remains in the hands of a disbursing officer, it is as much the money of the United States as if it had not been drawn from the treasury. Until paid over by the agency of the government to the person entitled to it, the fund cannot, in any legal sense, be considered a part of his effects. *45 U.S. at 20-21.*" *Id.* The court goes on to compare Desire to the community services agency in *Palmiter v. Action, Inc.,* another case on which the *Universal* court relies heavily. It noted that the agency was

> "only one link in the bureaucratic chain necessary to move funds from the United States Treasury to local communities" pursuant to an intricate grant system developed by Congress. [*Palmiter v. Action, Inc*.] 548 F.Supp. [1166] at 1168 [(N.D.Ind. 1982)]. Even though Action is not a federal agency, its management of the federal funds it received nevertheless was governed by pervasive federal legislation and regulations which specified the purposes for which the funds could be used.

*Universal Security*, 223 B.R. at 91 (*quoting Palmiter v. Action, Inc*. 733 F.2d at 1247-48)(footnote omitted). The trust characteristics are no lost so long as the funds or their proceeds are held by the disbursing agency. Only when the property is sold to a third party could the creditors of the third party attach the real property. The court finds that the grant money and the 14 tracts which are the proceeds of that money or direct governmental property grants are

not available to creditors. There is one tract for which the source is not the proceeds of grants. The debtor has offered to abandon that property and to allow creditors to pursue it.

Based on the forgoing analysis and subject to a proposal to liquidate the property and pay the proceeds to creditors, the court finds that the plan does not propose to pay creditors less than they would receive in a Chapter 7 proceeding.

### B. No Impaired Class Has Accepted the Plan

The objecting creditors also raise the issue that the Plan violates 11 U.S.C. § 1129(10). The objecting creditors argue that there is no class of impaired creditors which has accepted the Plan. The Bankruptcy Code states that a claim is impaired unless the legal, equitable, and contractual rights to which such claim or interest is entitled are left unaltered by the Plan. 11 U.S.C. § 1124(1).The only creditor that accepted the Plan is Regions Bank. In the disclosure statement and Plan, the claims for Region Bank's revolving line and credit card debt were listed as unimpaired. "*Second Amended Disclosure Statement,*" Section VI.3.03, p. 10 (docket entry no. 268); "*Modified Plan of Reorganization Dated June 30, 2011,*" Section III.3.03, p. 6 (docket entry no. 148). The counsel for the debtor announced at the confirmation hearing that the language in the Plan was incorrect and that Regions Bank was, in fact, impaired as the debtor was going to restructure the debt with Regions Bank. Mr. Wheeler testified at the hearing that the Regions Bank loan would be restructured. Counsel for the debtor commented in closing that the payment of the debt would be delayed and that constituted impairment. The court finds that this change in terms would constitute impairment. "[I]mpairment apparently can be of nominal financial significance, since Congress rejected the Commission's recommendation that impairment be deemed to exist only if the class is materially and adversely affected." 6 Norton Bankr. L. & Prac. 3d, § 113:5 (2011)(footnotes omitted). *See also In re Patrician St. Joseph Partners Ltd. Partnership*, 169 B.R. 669 (D.Ariz. 1994) (secured creditor's monthly payment reduced by $113 dollars a month was impairment and delay of 90 days for payment of administrative convenience class of creditors was impairment).

The court finds that Class 2.03 Regions Bank is impaired and has accepted the Plan. The requirement of 1129 (a)(10) has been satisfied.

### C. The Plan Discriminates Unfairly

Since the debtor has not obtained the acceptance of all of the classes of creditors, it must demonstrate that it has not unfairly discriminated against the objecting creditors and that its plan is fair and equitable. 11 U.S.C. § 1129(b)(1). First with respect to unfair discrimination, Mr. Wheeler testified for the debtor that the revolving line of Regions Bank and the credit card balance owed to Regions Bank were different from the debts of Seedco and CCDFI. Because the Regions Bank debts were debts incurred to facilitate the debtor's operations in furtherance of the THDA and HOME grants, the debtor could use the proceeds from the grants and the sales of grant funded real estate to pay those obligations. The debts of Seedco and CCDFI arose from a project that was outside the scope of the THDA and HOME grants and the grant proceeds cannot be used to pay on those debts without the risk of the debtor losing all of its access to grant funds. The court having found that the debtor's property derived from those two grant sources is restricted, the court finds the debtor's business reason for treating the claims differently to be sufficient to overcome any contention that the treatment of the objecting creditors is unfair discrimination.

### D. The Plan Is Not Fair and Equitable

Section 1129(b)(2)(B) defines a fair and equitable plan as being one with respect to a class of unsecured claims which provides that each holder of a claim of such class receive or retain on account of its claim property of a value, as of the effective date of the plan equal to the allowed amount of such claim or which provides that no holder of any claim or interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or interest. In this case, the objecting creditors are not receiving the amount of their allowed claims, so the court must address whether any junior interest holder is retaining any property. The debtor is a not-for-profit corporation. The objecting creditors have not identified any junior interest holder that is retaining any property. Interest has been construed to be "that which is held by an 'equity security holder.'" *In re General Teamsters, Warehousemen and Helpers Union Local 890,* 225 B.R. 719, 736 (Bankr. N.D. Cal. 1998); *In re Corcoran Hosp. Dist.,* 233 B.R. 449, 458 (Bankr. E. D. Cal. 1999); *Matter Wabash Valley Power Ass'n, Inc.,* 72 F. 3d 1305, 1313 (7th Cir. 1995). In a case in which the debtor does not have equity holders such as a non-profit corporation or a municipality or an electric cooperative, there is no junior class and so there can be nothing that the

non-existent junior class is retaining or receiving. As such, the continued operation of the debtor in this case does not violate the absolute priority rule.

The objecting creditors did raise the issue with respect to one lot which was not purchased with grant proceeds.[6] The lot is valued at approximately $5,000. The debtor at the confirmation hearing offered to abandon the properties so that there would be no question that the properties were available to the creditors. The court finds that abandonment is not acceptable, and that the Mr. Wheeler testified that the properties were worth approximately $5,000. The court will not allow the debtor to abandon unencumbered assets just to facilitate confirmation. The court will confirm the plan; however, the debtor must liquidate the property and provide for the proceeds to be distributed to creditors.

## CONCLUSION

The court finds that the plan meets the requirement of 11 U.S.C. § 1129 and subject to the court's requirement that the debtor dispose of the one lot acquired with non-grant funds, the plan is confirmable. The debtor shall have 10 days to further amend the Plan to comply with its announced amendment to show Regions Bank as impaired and to provide for the sale of the lot. Upon receipt of the amended plan the court will enter the order confirming the plan.

# # #

---

[6] *See* note 4, *supra*.